UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FILED

AUG 1 0 2007

USDC WI

| | |
|---|---|
| JOHN F. SPECIAL, on behalf of himself and all others similarly situated,<br><br>              Plaintiff,<br><br>      - against -<br><br>AMARANTH ADVISORS, L.L.C., AMARANTH LLC, AMARANTH GROUP INC., AMARANTH INTERNATIONAL LIMITED, AMARANTH PARTNERS LLC, AMARANTH CAPITAL PARTNERS LLC, AMARANTH ADVISORS (CALGARY) ULC, NICHOLAS M. MAOUNIS, BRIAN HUNTER, MATTHEW DONOHOE, ALX ENERGY, INC., JAMES DeLUCIA, J.P. MORGAN FUTURES, INC., and J.P. MORGAN CHASE & CO.,<br><br>              Defendants. | Docket No.<br>07 Civ. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**07 CIV. 7181** |

Plaintiff John F. Special ("Plaintiff"), by his undersigned attorneys, brings this action

against Defendants Amaranth Advisors, L.L.C., Amaranth LLC, Amaranth Group Inc., Amaranth

International Limited, Amaranth Partners LLC, Amaranth Capital Partners LLC, Amaranth

Advisors (Calgary) ULC, Nicholas M. Maounis, Brian Hunter, Matthew Donohoe (collectively,

"Amaranth" or the "Amaranth Defendants"), ALX Energy, Inc., James DeLucia (collectively, the

"Floor Trading Defendants"), J.P. Morgan Futures, Inc. ("JP Futures") and J.P. Morgan Chase &

Co. ("JPMC") (collectively, the "JPM Defendants" and with the Amaranth Defendants and the

Floor Trading Defendants, "Defendants"), pursuant to the Commodity Exchange Act, as

amended, 7 U.S.C. § 1, *et seq.* (the "CEA"), on behalf of himself and all others who purchased

and/or sold natural gas futures and options contracts on the New York Mercantile Exchange

("NYMEX") between February 23, 2006 and September 20, 2006 (the "Class Period").

Plaintiff's allegations as to himself and his own actions are based upon his personal knowledge and to information obtained during the course of his attorneys' investigation and upon information and belief as to all other matters, as follows:

## SUMMARY OF ALLEGATIONS

1.    This action arises from the Amaranth Defendants' intentional and unlawful manipulation of the prices of NYMEX natural gas futures contracts during the Class Period in violation of the CEA.

2.    As is more fully alleged below, during the Class Period:

a.    The Amaranth Defendants intentionally drove up the price of NYMEX natural gas futures contracts as part of a trading scheme to artificially increase the "spread" between the prices of NYMEX natural gas futures contracts for delivery of natural gas during the summer months and those for delivery during the winter months in order to benefit Amaranth's NYMEX and over-the-counter natural gas trading positions.

b.    The Amaranth Defendants manipulated the final, or "settlement," price of the "prompt-month" NYMEX natural gas futures contract by selling an extraordinary amount of such contracts during the final day of trading.  Amaranth engaged in such conduct with the purpose and effect of driving down the settlement price of the prompt-month NYMEX natural gas futures contract in order to benefit their natural gas positions, including natural gas swaps, held on electronic energy exchanges, such as the Intercontinental Exchange ("ICE"), whose value increased as a direct result of the decrease in the settlement price of the expiring NYMEX natural gas futures contract.  Thus, for every dollar lost on its sales of its NYMEX natural gas futures positions, Amaranth would gain multiple dollars on its natural gas positions on ICE and other electronic energy exchanges.

c.      In support of their manipulative acts, the Amaranth Defendants, with the assistance, knowledge, and support of the Floor Trading Defendants and JPM Defendants: (i) repeatedly violated or caused to be violated NYMEX exchange rules by amassing substantial NYMEX natural gas futures contract positions that exceeded applicable position limits; and (ii) concealed their manipulative trading from regulators and market participants by restructuring and eventually increasing the size of Amaranth's natural gas positions on ICE after Amaranth was ordered by NYMEX to reduce its natural gas positions which were so large that they were distorting natural gas market prices.

d.      Defendant JP Futures was Amaranth's clearing broker at NYMEX. As Amaranth's clearing broker, JP Futures was the NYMEX's counterparty for all positions it cleared in the customer account with NYMEX, including the positions held by Amaranth. Defendant JP Futures knew Amaranth's entire natural gas portfolio, and knew that Amaranth's positions and trading strategies were designed to manipulate NYMEX natural gas futures and options contract prices. By knowingly financing and supporting Amaranth's manipulative trading, JP Futures, with the knowledge and consent of its parent, Defendant JPMC, aided and abetted the Amaranth Defendants' manipulation of NYMEX natural gas futures prices in violation of the CEA.

e.      Defendants ALX Energy, Inc. and James DeLucia were Amaranth's floor traders on NYMEX. By knowingly executing Amaranth's manipulative schemes by effecting Amaranth's trades in the NYMEX natural gas "pit," the Floor Trading Defendants aided and abetted the Amaranth Defendants' manipulation of NYMEX natural gas futures prices in violation of the CEA.

3.      On June 25, 2007, the U.S. Senate Permanent Subcommittee on Investigations

issued a report summarizing the conclusions of its investigation into Amaranth and excessive speculation in the natural gas market. The Committee concluded, *inter alia*, that Amaranth's 2006 positions in the natural gas market constituted "excessive speculation," that it "had a direct effect on U.S. natural gas prices and increased price volatility in the natural gas market," and "caused significant price movements in the natural gas market demonstrat[ing] that excessive speculation distorts prices, increases volatility, and increases costs and risks for natural gas consumers, such as utilities, who ultimately pass on inflated costs to their customers."

4.      On July 25, 2007, the U.S. Commodity Futures Trading Commission ("CFTC") filed a complaint for injunctive and other equitable relief, and civil monetary penalties against Defendants Amaranth Advisors, L.L.C., Amaranth Advisors (Calgary) ULC, and Brian Hunter for attempted manipulation of natural gas futures contract prices during 2006 in violation of the CEA.[1]

5.      On July 26, 2007, the Federal Energy Regulatory Commission ("FERC") issued an Order to Show and Notice of Proposed Penalties (the "Order to Show Cause") against Defendants Amaranth Advisors, L.L.C., Amaranth LLC, Amaranth Group Inc., Amaranth International Limited, Amaranth Partners LLC, Amaranth Capital Partners LLC, Amaranth Advisors (Calgary) ULC, Brian Hunter, and Matthew Donohoe for alleged manipulation of NYMEX natural gas futures prices during 2006. In the Order to Show Cause, the FERC seeks civil penalties, and disgorgement of unjust profits, of nearly $300,000,000 against these

---

[1]      A copy of the CFTC's complaint is available on the CFTC's website, http://www.cftc.gov/stellent/groups/public/@lrenforcementactions/documents/legalpleading/enfa maranthcomplaint072507.pdf.

Amaranth Defendants.[2]

6.    By reason of Defendants' unlawful conduct, the prices of NYMEX natural gas futures and options contracts were manipulated to artificial levels during the Class Period in violation of the CEA.  As a direct, proximate and foreseeable result thereof, Plaintiff and members of the Class have suffered damages.

## JURISDICTION AND VENUE

7.    Natural gas is a "commodity" and is the "commodity underlying" natural gas futures and options contracts traded on the NYMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

8.    This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, 28 U.S.C. §§ 1331 and 1337.

9.    Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b), (c) and (d).  The Defendants transacted business in the Southern District of New York, the claims arose in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.  Defendant's unlawful acts manipulated the prices of NYMEX natural gas futures and options contracts which were traded in this district in which NYMEX is located, at One North End Avenue, New York, New York.

10.    Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

---

[2]    A copy of the FERC's Order to Show Cause is available on the FERC's website, http://www.ferc.gov/EventCalendar/Files/20070726084235-IN07-26-000.pdf.

## PARTIES

11.    Plaintiff traded NYMEX natural gas futures and options contracts during the Class Period. Plaintiff was damaged by Defendants' manipulation of the prices of NYMEX natural gas futures and options contracts to artificial levels.

12.    Defendant Amaranth Advisors, L.L.C. ("Amaranth Advisors") is a Delaware limited liability corporation, which was founded in September 2000, having its principal place of business at One American Lane, Greenwich, Connecticut. At all times relevant hereto, Defendant Amaranth Advisors served as the investment advisor and manager of the Amaranth group of investment funds including Defendant Amaranth LLC, a multi-strategy private investment fund with substantial investments in energy. Defendant Amaranth Advisors was the entity that employed the natural gas traders under the Advisory Agreement between Amaranth LLC and Amaranth Advisors L.L.C., and was a broadly empowered agent of the Amaranth Defendants.

a.    At the close of 2005, Amaranth had net assets of over $8 billion, natural gas futures positions valued at over $5 billion, and employed over 600 people in its Greenwich, Connecticut headquarters and seven other offices worldwide. In September 2006, Amaranth experienced significant losses from its natural gas positions that ultimately resulted in the pending and well-publicized dissolution of that firm. Although Amaranth's trading operations ceased in 2006, at present the assets of Amaranth exceed $600,000,000.

13.    Defendant Amaranth LLC ("Amaranth LLC"), a Cayman Islands company, is a multi-strategy trading fund advised by Defendant Amaranth Advisors L.L.C. and its affiliates. Amaranth LLC serves as a "master fund" in a "master-feeder" fund structure. At all times relevant hereto, Amaranth's investors invested directly into three feeder funds (Amaranth

International Limited, Amaranth Partners LLC, and Amaranth Capital Partners LLC), which invested substantially all of their capital in Amaranth LLC. Amaranth LLC then invested its funds on a global basis in a host of trading vehicles. Amaranth LLC currently possesses substantial assets related to the operation of the Amaranth entities.

14.     Defendant Amaranth Group Inc. ("Amaranth Group") is a Delaware S corporation owned 100 percent by Defendants Amaranth LLC and Nicholas Maounis. As of May 1, 2006, Amaranth Group owned one percent and served as general partner of Amaranth Management Limited Partnership, a Delaware holding entity, which entity in turn owned 78 percent of Amaranth Advisors L.L.C. At all times relevant hereto, Amaranth Group employed all the natural gas traders, including Defendant Brian Hunter, Defendant Matthew Donohoe, as well as the executives such as the President and Chief Investment Officer, Defendant Maounis. At all times relevant hereto, Amaranth Group Inc. was a service provider to the Amaranth group of funds, including Amaranth LLC.

15.     Defendant Amaranth International Limited ("Amaranth International") is a Bermuda company. At all times relevant hereto, Defendant Amaranth International served as an off-shore "feeder fund" for non-United States and tax-exempt investors, in the "master-feeder" fund structure. At all times relevant hereto, investors invested directly into Amaranth International, which invested substantially all of its capital in Amaranth LLC.

16.     Defendants Amaranth Partners LLC and Amaranth Capital Partners LLC are Delaware Limited Liability Companies. At all times relevant hereto, they both served as a domestic "feeder fund" for United States taxable investors, in the "master-feeder" fund structure. During the Class Period, investors invested directly into these entities, which then invested substantially all of their capital in Amaranth LLC.

17.    Defendant Amaranth Advisors (Calgary) ULC ("Amaranth ULC") is a Nova Scotia, Canada company, registered with the Alberta Securities Commission, that Amaranth established as an energy advisor entity to allow Defendant Hunter and his team to move their trading operation from Greenwich, Connecticut to Calgary, Alberta. Most of Amaranth ULC's officers were based in Greenwich, as were the other Amaranth employees assigned to perform support functions for the Calgary trading operation. At all times relevant hereto, Amaranth ULC was an indirect subsidiary of Amaranth Advisors.

18.    Defendant Nicholas M. Maounis ("Maounis"), an individual, is the founder and, at all times relevant hereto, served as the Chief Executive Officer and Managing Member of Amaranth Advisors. The Amaranth Defendants were in practice a tightly knitted association-in-fact, which operated as a single entity under the direction of Defendant Maounis. Accordingly, at all times relevant hereto, Defendant Maounis had *de jure* and *de facto* control over the Amaranth Defendants, each of which acted under the direction, and at the behest of, Defendant Maounis.

19.    Defendant Brian Hunter is an individual and Canadian citizen who, at all times relevant hereto, was the head natural gas trader at Amaranth. In or around October 2005, Defendant Hunter transferred from Amaranth's Greenwich, Connecticut office to Calgary and became head of energy trading in the Calgary office. Certain natural gas traders under Defendant Hunter's supervision continued to work at the Greenwich office, and risk management and compliance personnel in charge of overseeing the trading of the Calgary office continued to work in Greenwich. At all times relevant hereto, Defendant Hunter served as the President of Amaranth ULC. Defendant Hunter's compensation in 2005 was over $75 million.

20.    Defendant Matthew Donohoe is an individual who, at all times relevant hereto,

served as Defendant Hunter's "execution trader." According to Defendant Donohoe, Defendant Hunter would "direct macro strategy, and [Donohoe] would implement it via trading." As such, Defendant Donohoe would place the orders with Amaranth's NYMEX floor brokers, including the Floor Trading Defendants, or execute trades with counterparties on behalf of Defendant Hunter's trading book.

21.    Defendant ALX Energy, Inc. ("ALX"), a New York corporation, was, at all times relevant hereto, Amaranth's primary NYMEX natural gas floor brokerage firm. Amaranth was ALX's largest customer, and one of its key employees, Vincent Rufa, traveled to Calgary and socialized with Amaranth employees on multiple occasions. Throughout the Class Period, ALX had knowledge of, and aided and abetted, the Amaranth Defendants' manipulation of NYMEX natural gas futures and options prices in violation of the CEA.

22.    Defendant James DeLucia ("DeLucia") was, at all times relevant hereto, Chairman or Chief Executive Officer of Defendant ALX, and Amaranth's primary NYMEX natural gas floor broker. Throughout the Class Period, Defendant DeLucia had knowledge of, and aided and abetted, the Amaranth Defendants' manipulation of NYMEX natural gas futures prices in violation of the CEA.

23.    Defendant J.P. Morgan Futures, Inc. ("JP Futures"), a Delaware corporation and a CFTC-registered futures commission merchant, was, at all times relevant hereto, Amaranth's clearing broker at NYMEX, and aided and abetted the Amaranth Defendants' manipulation of NYMEX natural gas futures and options prices in violation of the CEA.

24.    Defendant J. P. Morgan Chase & Co. ("JPMC") is a diversified banking, investment banking and brokerage firm headquartered at 270 Park Avenue, New York, New York. Defendant JPMC is the parent of Defendant JP Futures and, at all times relevant hereto,

had *de jure* and *de facto* control over Defendant JP Futures.

25.    The acts alleged in this Complaint to have been committed by the Defendants were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of each of the Defendants' affairs.

## SUBSTANTIVE ALLEGATIONS

### I.    Background

26.    NYMEX has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. NYMEX submits to the CFTC various rules and regulations for approval through which the NYMEX designs, creates the terms of, and conducts trading in various commodity futures and options, including futures and option contracts for natural gas.

27.    A futures contract is an agreement to buy or sell a commodity, such as natural gas, at a date in the future. Every aspect of a futures contract traded on the NYMEX, such as the contracts for natural gas, is standardized, except the price. Futures markets are specifically designed to facilitate and ease trading in one central market place for traders who are located throughout the United States.

28.    Futures contracts have two sides. The "long" side is the buyer of the contract and is obligated to take delivery and pay for the commodity if the buyer holds the contract until the delivery date. The "short" side is the seller of the contract and is obligated to make delivery of the commodity on the delivery date.

29.    Only a small percentage of all futures contracts traded each year result in delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of natural gas

by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

30.     NYMEX uses the "Henry Hub" as the point of delivery for natural gas pursuant to its futures contracts. The Henry Hub is the largest centralized point for natural gas spot trading in the United States and is physically situated at Sabine's Henry Gas Processing Plant.

31.     Henry Hub is an example of a "Market Hub," operating as a physical transfer point (commonly known as "headers"), where numerous pipelines are connected to a facility that allows for the redirection of gas volumes from one pipeline to another.

32.     Market Hubs offer services that facilitate the buying, selling and transportation of the actual natural gas within the local facility including, but not limited to, making arrangements for storage and plant processing services, transfer of title for natural gas sales and purchases, and transportation of the natural gas.

33.     The Henry Hub links nine interstate and four intrastate pipelines, including Acadian, Columbia Gulf, Dow, Equitable (Jefferson Island), Koch Gateway, LRC, Natural Gas Pipe Line, Sea Robin, Southern Natural, Texas Gas, Transco, Trunkline and Sabine's mainline.

34.     Prices for all natural gas futures contracts are quoted in 10,000 MMBtu. The market for Henry Hub natural gas futures contracts is the benchmark for forward natural gas markets because of its liquidity and transparency.

35.     The "settlement price" of a NYMEX natural gas futures contract is the volume-weighted average price of trades made during the 30-minute "settlement period," which is the last 30 minutes of trading on the termination day for the "prompt-month" contract. The "prompt-month" is the next calendar month. The "termination day" for NYMEX natural gas futures contracts is the third-to-last business day of the month preceding the prompt month, and

the settlement period occurs from 2:00 p.m. to 2:30 p.m. on the termination day (except when the NYMEX is operating on a holiday schedule). So, for example, for August 2007, the prompt-month contract is the September 2007 NYMEX natural gas futures contract. The last business day for August 2007 is Friday, August 31, so the settlement period for the September 2007 NYMEX natural gas futures contract will take place from 2:00 p.m. to 2:30 p.m. on Wednesday, August 29, 2007.

36.     If a market participant holds its positions to the end of the settlement period for the prompt-month contract, the market participant is obligated to "go to delivery." That is to say, the "futures" contract for the prompt month becomes a present contractual obligation for the purchase and sale of the physical gas. Longs must take delivery and shorts must make delivery of 10,000 MMBtu per contract over the course of the contract month, at the buyer's interconnection on the Sabine Pipe Line Co.'s Henry Hub in Louisiana.[3] The price for the gas that goes to delivery is the settlement price of the NYMEX natural gas futures contract.[4]

37.     As noted above, the vast majority of NYMEX natural gas futures contracts traded during the Class Period did not go to delivery. For instance, only approximately 1.6%, 1.5%, and 1.6%, respectively, of the open interest[5] of the March, April, and May 2006 NYMEX natural gas futures contract were settled by delivery.

38.     Most market participants prefer to avoid trading during the settlement period. As

---

[3]     See NYMEX Exchange Rulebook §§ 220.10-12, available at http://www.nymex.com/rule_main.aspx?pg=33.

[4]     See NYMEX Exchange Rulebook § 220.11(D), available at http://www.nymex.com/rule_main.aspx?pg=33.

[5]     "Open Interest" is the total number of futures contracts long or short in a delivery month or market that has been entered into and not yet liquidated by an offsetting transaction or fulfilled by delivery. CFTC Glossary, http://www.cftc.gov/opa/glossary/opaglossary_o.htm.

the time to termination is winding down, price risk and volatility may increase, while market liquidity and the remaining open interest are decreasing.  Most market participants liquidate or "roll" (meaning that they transfer their position into later contract months) their open long or short positions in the prompt-month NYMEX natural gas futures contract well before the settlement period.

39.     For a storable commodity, such as natural gas, there is a clear relationship between spot and futures contract prices.

40.     There is also a clear relationship between NYMEX natural gas futures contract prices and the market prices that prevail for a wide range of natural gas derivatives, including financially-settled natural gas futures "swaps"[6] and "basis swaps."[7]  Certain options also settle on the settlement price of a NYMEX natural gas futures contract.[8]

---

[6]     A natural gas futures "swap" (swap) is a purely financial instrument that operates much like the NYMEX natural gas futures contract except that, rather than becoming a physical delivery or purchase obligation, it settles financially at the termination of the NYMEX natural gas futures contract's final settlement price. Financial swaps do not entail physical delivery risk. The buyer in a swap transaction for a given contract month agrees to pay the seller a "fixed price," i.e., a specific amount determined at the time when the transaction occurs. The seller pays the buyer a "floating price," which will be the actual final settlement price for the NYMEX natural gas futures contract and which is not known at the time of the swap transaction. Thus, buyers and sellers hope to profit based on the relation between the price paid at the time of the transaction and the ultimate settlement price of the NYMEX natural gas futures contract; the buyer of the swap profits if the floating price (i.e., the actual final NYMEX natural gas futures contract settlement price) is higher than the fixed price at which the swap is trading at the time that the transaction takes place; the seller profits if the floating price is lower than the fixed price.

[7]     A "basis swap" is a derivative instrument whose value is based on the difference between the settlement price of the NYMEX natural gas futures contract for a given contract month and that of the monthly "index" at a specified location for that same month.

[8]     While options on prompt-month futures and other derivatives expire on the day before termination day, trading during the settlement period on termination day continues to affect the value of options on future-month instruments. Trading during the last two minutes on the termination day is particularly important, as options continue to trade at prices in relation to the price of the expiring NYMEX natural gas futures contract. Options and other derivatives are given a non-final settlement price based on trading during these two minutes, which determines

41.    The settlement prices for ICE swaps are pegged to the final settlement prices for the corresponding NYMEX futures contract. Therefore, the two instruments are functionally equivalent for risk management purposes, and (with minor deviations) their prices essentially move in lockstep with one another. Traders base their trading decisions on whether to transact in ICE swaps or NYMEX futures contracts based on factors such as which market has greater liquidity at a given time. Many traders have positions in multiple contracts on both exchanges at the same time.

42.    The price curves for ICE swaps and NYMEX futures contracts indicate that the price risks from purchasing ICE swaps are identical to the price risks from purchasing NYMEX futures contracts. Since both contracts are exchange-cleared, there exists no greater counterparty credit risk from trading in one market versus the other. While there exists a substantial volume of arbitrage trading attempting to exploit minor, temporary price discrepancies between the NYMEX and the ICE markets, the two markets' prices essentially move in lockstep, and the two markets function as a single, integrated market.

43.    However, there exists one crucial difference between the trading in ICE swaps and NYMEX futures contracts-the degree of regulatory oversight. CFTC Designated Contract Markets like NYMEX are subject to a panoply of regulation, including regulations that require and authorize them to prevent manipulative trading. Pursuant to a provision of the Commodities Futures Modernization Act of 2000 ("CFMA") referred to as the "Enron loophole" unregulated markets such as ICE (unlike Direct Contract Markets like NYMEX) have no legal obligation to monitor trading, prevent manipulation or price distortion, or ensure that trading is fair and orderly. Additionally, under the CFMA's "Enron loophole" the CFTC has neither the authority

---

the options' marked-to-market value for that day.

nor the obligation to monitor trading on unregulated exchanges such as the ICE.

**II.    Amaranth Dominated the U.S. Natural Gas Market**
**During the Class Period and Engaged in Excessive Speculation**

44.    Amaranth dominated trading in the U.S. natural gas financial markets during the

Class Period.

45.    During the Class Period, Amaranth accumulated massive natural gas futures

holdings on NYMEX and ICE spanning five years, from 2006 to 2010.

46.    Amaranth's 2006 positions in the natural gas market constituted excessive

speculation.  Amaranth accumulated such large positions and traded such large volumes of

natural gas futures on both NYMEX and ICE during the Class Period that it distorted natural gas

futures prices, artificially widened price spreads, and increased price volatility.

47.    During the Class Period, Amaranth bought and sold thousands of natural gas

contracts on a daily basis, and tens of thousands of contracts on certain days.  It accumulated tens

of thousands of natural gas holdings, or "positions," on both NYMEX and ICE.  All but a few of

the largest energy companies, and hedge funds consider trades of a few hundred contracts to be

large trades.[9]

48.    During parts of the Class Period, Amaranth held as many as 100,000 natural gas

contracts in a single month, representing 1 trillion cubic feet of natural gas, or 5% of the natural

gas used in the entire United States in a year.  At other times during the Class Period, Amaranth

controlled 40% of all of the outstanding contracts on NYMEX for natural gas in the winter

season (October 2006 through March 2007), including as much as 70% of the outstanding

---

[9]    The CFTC defines a "large trader" for reporting purposes in the natural gas
market as a trader who holds at least 200 contracts; NYMEX examines a trader's position if it
exceeds 12,000 natural gas contracts in any one month.

contracts to deliver natural gas in November 2006. On almost everyday from mid-February through July 2006, Amaranth held more than 50% of the open interest on NYMEX in the January 2007 and November 2006 NYMEX natural gas futures contracts.

49.      In late July 2006, Amaranth held a total of more than 80,000 NYMEX and ICE natural gas contracts for January 2007, representing a volume of natural gas that equaled the entire amount of natural gas eventually used in that month by U.S. residential consumers nationwide. During parts of the Class Period, Amaranth's trading represented almost 70% of the total NYMEX trading volume in a given contract on a given date, and at certain points during the Class Period, Amaranth controlled between 25% and 48% of the outstanding contracts (open interest) in all NYNEX natural gas futures contracts for 2006, and approximately 30% of the outstanding contracts (open interest) in all NYMEX natural gas futures contracts for 2007.

## III.    Defendants' Manipulation of the Spreads Between the Prices of Natural Gas Futures Contracts During the Class Period

50.      During February through August 2006, Amaranth intentionally drove up the price of NYMEX natural gas futures contracts as part of a trading scheme to artificially increase the "spread" between the prices of futures contracts for delivery of natural gas during, among other periods, the summer of 2006 and those for delivery during the winter of 2006-2007.

51.      Amaranth's large positions and trades caused significant price movements in key natural gas futures prices and price relationships. For example, Amaranth's purchases of contracts to deliver natural gas in the winter months of 2006, in conjunction with Amaranth's sales of natural gas contracts for delivery in the summer months of 2006, drove winter prices far above summer prices. These differences between winter and summer prices, called "price spreads," were far higher in 2006 than in previous years—until the collapse of Amaranth, when the price spreads returned to historical levels.

52.     On several specific dates, Amaranth's massive trades were responsible for large jumps in the price differences between the NYMEX natural gas futures contracts for March and April 2007.

53.     Purchasers of natural gas during the summer of 2006 for delivery in the following winter months paid artificially inflated prices due to Amaranth's large-scale speculative trading. Businesses such as utilities had to either absorb this added expense or pass the higher costs onto consumers.

54.     Despite higher-than-usual inventories of physical natural gas, unusually high winter/summer price spreads persisted throughout the February through September, 2006 period. According to a report on an investigation conducted by the Senate Permanent Subcommittee on Investigations, which reviewed subpoenaed natural gas trading records from NYMEX, ICE, Amaranth, and other traders (comprising data concerning several million individual trades), the extreme levels of winter/summer price spreads were driven by Amaranth's excessive speculative trading in natural gas contracts on both NYMEX and ICE, persisting over several months. Traders interviewed by the Subcommittee said that during the spring and summer of 2006 the differences between winter and summer prices were "clearly out-of-whack," at "ridiculous" levels, and unjustified by supply or demand.

55.     The Amaranth Defendants intentionally caused artificial prices for NYMEX natural gas futures via their trading strategies calculated to cause (and capitalize on) wide price "spreads" between summer 2006 and winter 2006-2007 NYMEX natural gas futures contracts.

56.     The JPM Defendants knew that Amaranth's spread positions had the effect of creating artificial prices and, despite this knowledge, continued to finance such positions despite violations of NYMEX position limits.

IV.    **The Amaranth Defendants' Manipulation of the Settlement Prices
of NYMEX Natural Gas Futures Contract During the Class Period**

57.    During the Class Period, Amaranth manipulated the settlement prices of NYMEX

natural gas futures contracts, including, *inter alia,* the settlement prices of the March, April and

May 2006 NYMEX natural gas futures contract, in order to benefit their positions in financially

settled natural gas derivatives, including swaps and options contracts, traded on ICE and other

electronic energy exchanges.[10]

58.    Amaranth's manipulative scheme included, in part, the purchase of a substantial

amount of NYMEX natural gas futures contracts shortly before the closing range that Amaranth

planned to sell during the last half hour on the final day of trading such contracts.

59.    As noted *infra*, in accordance with NYMEX Rules, the settlement price of the

NYMEX natural gas futures contracts is determined by the volume weighted average of trades

executed from 2:00-2:30 p.m. ("closing range") on the last day of trading of such contracts

("expiration day").

60.    Amaranth created artificial NYMEX natural gas futures prices by placing large

sell orders in the closing range on expiration day.

61.    On the NYMEX natural gas expiration days for February, March, and April 2006,

Amaranth held, as compared to its NYMEX futures position, a substantially larger short natural

gas financially-settled positions, primarily on ICE.

62.    Amaranth's manipulation of the prices of the NYMEX natural gas futures

contracts during settlement was intended to benefit Amaranth's substantially larger short natural

---

[10]    For instance, the ICE natural gas swap is a look-alike swap that is financially
settled, meaning that upon expiration of the swap the holder will either pay or be paid the
difference in the price paid for the swap and the final settlement price of the swap.  In calculating
the settlement price for its natural gas swaps, ICE uses the NYMEX settlement price.

gas swaps positions on ICE and elsewhere.

63.    By reason of Amaranth's manipulation of the settlement prices of NYMEX natural gas futures contracts during the Class Period, the prices of NYMEX natural gas futures and options contracts traded throughout the Class Period were artificial.

**A.    Amaranth's Manipulation of the March 2006
NYMEX Natural Gas Futures Contract Settlement Price**

64.    Amaranth's manipulation of the settlement price of NYMEX natural gas futures prices began, as Defendant Hunter stated in an instant message, as "a bit of an expiriment" [sic] devised on or before February 23, 2006. This "experiment" was repeated and refined throughout the Class Period and was carried out by Amaranth by entering into long NYMEX natural gas futures positions shortly before expiration for the purpose of selling the positions during the closing range in order to artificially drive down the settlement price. While Amaranth lost money on the NYMEX positions sold at a loss, at the same time they made multiples of their losses on their positions in ICE.

65.    On February 23, 2006, the day prior to the expiration of the March 2006 NYMEX natural gas futures contract (the "March 2006 contract"), Defendant Hunter told Defendant Donohoe "make sure we have lots of futures to sell MoC [market on close] tomorrow."[11] Defendant Hunter thus instructed Defendant Donohoe to buy a large number of March 2006 contracts before the close the next day so that Amaranth would have "lots" of contracts to sell "MoC," that is, during the close.

66.    At that time, Amaranth operations personnel in Greenwich informed Defendant

---

[11]    *See* instant message attached as Exhibit A (document number AALLC_REG0684056) to the CFTC Complaint which is available on the CFTC's website, http://www.cftc.gov/stellent/groups/public/@lrenforcementactions/documents/legalpleading/enfa maranthcomplaint072507.pdf.

Hunter and his natural gas traders that they were "short – 1729 Nat Gas Mar 06" futures contracts and to "[p]lease make sure we are flat by the end of the day today."[12] Therefore, Amaranth would have had to buy only 1,729 March 2006 NYMEX natural gas contracts if its objective was merely to go "flat by the end of the day today."   But, if it wanted to have "lots" of futures to sell MoC, it would have to buy additional contracts to build a long position.  That is what it did.  In fact, Amaranth bought in excess of 4,800 March 2006 contracts the next day, taking its position from short, past "flat" and then to long sometime around noon.

67.    Thus, as part of the manipulative scheme, on February 24, 2006 before the start of the closing range, Amaranth reversed its natural gas futures positions from being short to being long over 3000 March 2006 contracts.

68.    On February 24, 2006 prior to the closing range, Defendant Hunter stated to another Amaranth natural gas trader that he would "just need H [the March 2006 contract] to get smashed on settle then day is done."[13]

69.    Defendant Hunter has testified that the term "smashed" in the context of futures prices means "if something fell really, really quickly, if the prices fell really, really quickly, you say those prices got smashed."

70.    Less than half an hour before the closing range on February 24, 2006, Defendant Hunter disclosed part of the manipulation to a natural gas trader at another firm:

| 1:31:25 PM EST Brian Hunter: | We have 4000 to sell MoC |
| 1:31:28 PM EST Brian Hunter: | shhhh |
| 1:31:36 PM EST gloverb: | come on |

---

[12]    *See* e-mail attached as Exhibit A (document number AALLC_REG0672597) to the CFTC's Complaint.

[13]    *See* instant message attached as Exhibit A (document number ALLC_REG0684186) attached to the CFTC's Complaint.

| | |
|---|---|
| 1:31:39 PM EST Brian Hunter: | y |
| 1:31:43 PM EST gloverb: | unless you are huge bearish |
| 1:31:49 PM EST gloverb: | position |
| 1:31:54 PM EST gloverb: | why the f would yo do that |
| 1:32:16 PM EST Brian Hunter: | all from options yestrday |
| 1:32:25 PM EST Brian Hunter: | so we ll see what the floor has |
| 1:32:33 PM EST Brian Hunter: | bit of an expiriment [sic] mainly |
| 1:32:43 PM EST gloverb: | what the f |
| 1:32:46 PM EST gloverb: | that is huge |
| 1:35:34 PM EST Brian Hunter: | I think John [Arnold] and Sempra [Energy] are sellers too.[14] |

71.    In the meantime, Defendant Hunter let Defendant Donohoe know he would be contacting Amaranth's primary NYMEX floor brokerage firm, ALX Energy, and its chief floor trader, and specifically Vincent Rufa, one of ALX's phone clerks, to advise the Floor Trading Defendants of Amaranth's intentions so that when it came time to execute the trades, the broker, Defendant James DeLucia, would have considered, in advance, how to execute the order so as to maximize the intended effect. The Floor Trading Defendants therefore had knowledge of Amaranth's intent to drive down prices on the close on February 24.

72.    The Floor Trading Defendants' resulting selling activity on behalf of Amaranth, in one manner or another, disseminated to the pit on behalf of Amaranth that Amaranth would be a large seller. During the settlement period, James DeLucia, the ALX floor broker, known in the pit as Jim X, traded on Amaranth's behalf. Another trader, Eric T. Bolling, stood only five feet away from DeLucia in the pit. Of the trades that DeLucia executed on behalf of Amaranth during the close, approximately 26 percent went to Bolling, more than any other trader associated with Amaranth. Bolling was thus an eyewitness to the Amaranth selling and recalled in vivid detail the events of that settlement. He later testified that the March contract close on February 24

---

[14]    *See* instant message attached as Exhibit A (document number AALLC_REG0684227) attached to the CFTC's Complaint.

involved a "dramatic sell off . . . [that was] probably more emphatic [than a typical close because of] the speed at which it dropped, 50 cents."[15]

73.    A few minutes after the start of the closing range on February 24, 2006, the same natural gas trader who corresponded with Defendant Hunter earlier asked Defendant Hunter "arent you done" selling your futures.  Defendant Hunter, knowing that the manipulation was not yet concluded, replied "no . . . have a lot more to sell . . . waiting until 2:20."[16]

74.    Defendants Hunter and Donohoe congratulated themselves about halfway through the closing range on February 24, 2006, when Defendant Hunter stated to Defendant Donohoe, "today came together quite nicely," and Defendant Donohoe later replied:

| | |
|---|---|
| 2:30:41 PM EST Matthew Donohoe: | h [March contract] will settle lower |
| 2:30:47 PM EST Matthew Donohoe: | and h/j wider |
| 2:31:30 PM EST Matthew Donohoe: | nice |
| 2:31:37 PM EST Brian Hunter: | I am flexing here |
| 2:31:40 PM EST Matthew Donohoe: | looking preety [sic] bang on |
| 2:30:50 PM EST Matthew Donohoe: | we already mimiced |
| 2:31:53 PM EST Matthew Donohoe: | lol |
| 2:31:58 PM EST Matthew Donohoe: | rrrrrrrrrrrrrrrrrrrrrrrrrr |
| 2:32:04 PM EST Brian Hunter: | hahahahaha |
| 2:32:23 PM EST Matthew Donohoe: | 2nd best...sept/oct last year still the best |
| 2:32:27 PM EST Matthew Donohoe: | oh yeag [sic][17] |

75.    On February 24, 2006, during their selling spree on the closing range, Amaranth placed orders to sell over 3,000 March 2006 contracts to manipulate the price of that contract.

76.    Amaranth's net short position in the March 2006 contract and March swaps of (10,056.5) contracts would have benefitted by slightly more than $1 million per penny decrease

---

[15]    *See* p. 37, para. 68 of the FERC Order to Show Cause.

[16]    *See* instant message attached as Exhibit A (document number AALLC_REG0684264) attached to the CFTC's Complaint.

[17]    *See* instant message attached as Exhibit A (document number AALLC_REG0704931) to the CFTC's Complaint.

in the settlement price of the March 2006 contract.

77.    By reason of Amaranth's manipulation, the settlement price of the March 2006

contract was artificially deflated by as much as $0.29, resulting in a realized gain of $29,000,000

to Amaranth.  Specifically, prior to the beginning of the settlement period on February 24, 2006,

the March 2006 contract had been trading at around $7.40, but the prices declined sharply in the

first five minutes of the settlement period due to Defendants' manipulative acts, and the March

2006 contract ultimately settled at $7.11 (representing a decline of $0.29).

78.    In addition, Amaranth had a net short position of (16,613.25) April 2006 NYMEX

natural gas futures contracts (the "April 2006 contract") and swaps, which would have benefitted

by roughly $1.661 million per penny decrease in the April 2006 contract settlement price for the

day.  Amaranth's trading on February 24, 2006 caused the April 2006 contract to be manipulated

lower as much as $0.36, representing a marked-to-market gain for Amaranth of roughly

$60,000,000.  Moreover, according to Amaranth's contemporaneous records, the total one-day

net trading profits for Defendant Hunter's group on February 24, 2006 was $45,350,447.141.[18]

79.    As a result of Amaranth's manipulative trading, described in ¶¶ 64-67 above, the

FERC found Amaranth manipulated the settlement price of the March 2006 contract.

Amaranth's manipulation of the March 2006 contract settlement price also had the effect of

manipulating the price of the April 2006 contract and subsequent NYMEX natural gas futures

and options contracts.

**B.    Amaranth's Manipulation of the April 2006
        NYMEX Natural Gas Futures Contract Settlement Price**

80.    After the success of the "experiment" in the February 24 trading for the March

_____

[18]    *See* n. 141, p. 47 of the FERC's Order to Show Cause, which is available on the
FERC's website, http://www.ferc.gov/EventCalendar/Files/20070726084235-IN07-26-000.pdf.

2006 contract, Amaranth decided to repeat this strategy for the April 2006 contract on March 29, 2006.

81.    As on February 24, 2006, Amaranth held a large long position in the April 2006 contract prior to the settlement period, and proceeded to sell it "MoC" during the close, employing a nearly identical trading strategy as that used for manipulating the price of the March 2006 contract.

82.    On March 29, 2006, Amaranth entered the day with a long position of 1,603 April 2006 contracts. In three separate orders, Amaranth directed Defendant ALX to sell 303 April 2006 contracts prior to the close between 12:41 p.m. and 1:50 p.m. At 2:00 p.m. and 2:03 p.m. Amaranth placed further orders with Defendant ALX to sell 100 April 2006 contracts and 1,200 April 2006 contracts "MOC." Once again, Jim DeLucia ("Jim X" of ALX) was the selling broker in the trading ring.

83.    During the week prior, Amaranth built its aggregate April swap position from being short roughly (9,500) futures contract equivalents at the end of the day on March 21 to short (17,884) futures contract equivalents at the end of the day on March 29. Thus, although Amaranth's amount of April 2006 contract selling was less than its selling in the March 2006 contract, the amount of short swap contracts that Amaranth stood to benefit from a lowered natural gas futures contract prices was much greater.

84.    Amaranth profited by at least $11,200,000 from the manipulation of the April 2006 contract on March 29. Specifically, on March 29, 2006, the April 2006 contract was trading between about $7.26 and $7.32 in the half hour before and at $7.34 at 2:00 p.m., and then prices dropped right at the beginning of the settlement to about $7.15. From 2:00 p.m. to 2:30 p.m., the April 2006 contract traded in the range of $7.15 to $7.37 and settled at $7.233.

Accordingly, the Amaranth Defendants' manipulative trading caused the settlement price of the April 2006 contract to decrease by as much as $.09 from where it would have settled without such manipulation. Based on the foregoing, Amaranth's April 2006 contracts and April swap positions realized gains of $1.788 million per penny decrease in the settlement price of the April 2006 contract prices, for a total profit of $16,000,000. In addition, Amaranth had a net short position of (19,639.5) contracts in the May 2006 contract and swaps, whose value increased by about $1.964 million per penny decrease in the May 2006 contract settlement price for that day. Defendants' manipulative trading caused the May 2006 contract to settle lower by as much as $.13 for a marked-to-market gain of approximately $25,500,000 to Amaranth.

85.     As a result of Amaranth's manipulative trading, described in ¶¶ 80-84 above, the FERC found that Amaranth manipulated the settlement price of the April 2006 contract. Amaranth's manipulation of the April 2006 contract settlement price also had the effect of manipulating the price of the May 2006 contract and subsequent NYMEX natural gas futures contracts.

**C.    Amaranth's Manipulation of the May 2006**
     **NYMEX Natural Gas Futures Contract Settlement Price**

86.     On or about April 26, 2006, the expiration date of the May 2006 NYMEX natural gas futures contract (the "May 2006 contract"), Amaranth manipulated NYMEX natural gas futures contract prices by obtaining a large long futures May 2006 position in order to sell a large number of offsetting contracts using three large orders that were placed near the end of the closing range.

87.     On or about April 21, 2006, Amaranth reversed its May 2006 contract futures position by purchasing futures contracts, such that for the first time in the month they were long May 2006 contracts.

88.     From then until April 26, 2006, Amaranth continued to build its long futures

position, such that by the time of the closing range, it was long in excess of 3,000 May 2006

contracts.

89.     Going into the closing range on April 26, 2006, Amaranth also had a short May

swap position of over 19,000 contracts (futures equivalents).

90.     Defendant Hunter was concerned that Centaurus Advisors LLC, another hedge

fund, was going to be a large buyer of natural gas futures in the closing range and that this would

affect the settlement price of the May 2006 contract, which in turn would adversely affect

Amaranth's short swaps positions.

91.     Beginning at 12:45 pm on April 26, 2006, Defendant Hunter had an instant

message conversation with David Chasman ("Chasman"), the energy risk manager at Amaranth,

where he discussed what he thought Arnold planned to do and why:

| | |
|---|---|
| 12:48:48 pm Brian Hunter: | FYI Arnold is getting scary short into the [Energy Information Agency gas storage] number tomorrow |

*      *      *

| | |
|---|---|
| 12:50:26 pm David Chasman: | what u think arnold has? |
| 12:50:28 PM Brian Hunter: | we are rolling size into may |
| 12:50:42 pm Brian Hunter: | and I am worrie[d] that Anold [sic] has taken the other side of everything |
| 12:51:00 pm Brian Hunter: | so either he runs it up on the close today and gets short tomorrow |
| 12:51:08 pm Brian Hunter: | or has a HUGE view on the number tomorrow |

*      *      *

| | |
|---|---|
| 12:53:03 pm David Chasman: | other side of everything meaning buying from everyone else selling – or buying from [you] |
| 12:53:17 pm Brian Hunter: | no buying may and selling June ... with me |
| 12:54:37 pm David Chasman: | does he know what [you are] up [to] [with respect to] rolling off length? ... sorry rolling off short |
| 12:55:16 pm Brian Hunter: | probably |

|  |  |
|---|---|
| | *    *    * |
| 12:55:29 pm Brian Hunter: | I think its more that he thinks its going to get [f...d] tomorrow |
| | *    *    * |
| 12:55:47 pm Brian Hunter: | me may try to help it by running the market up on the close |
| | *    *    * |
| 12:56:10 pm David Chasman: | kinda hard to do when [you are] selling – no? |
| 12:56:39 pm Brian Hunter: | Arnold is the master of moving the close?[19] |

92.     Defendant Hunter expressed a similar sentiment to an outside trader in an instant message wherein Defendant Hunter wrote, "I think John [Arnold] wants to bid it on close."[20]

93.     To affect the settlement price for the May 2006 contract, Amaranth intentionally waited to sell its May 2006 contracts.

94.     At the beginning of the closing range on April 26, 2006, Defendant Hunter stated to an Amaranth risk manager that he is seeing many buyers but he (Defendant Hunter) has "yet to sell."[21]

95.     Also early in the closing range on April 26, 2006, Defendant Hunter stated to an Amaranth trader, Matthew Calhoun, "we are wa[i]ting to sell."[22]

---

[19]     *See* instant message attached as Exhibit A (document number A_CFTC032874) attached to the CFTC's Complaint.

[20]     *See* instant message attached as Exhibit A (document number AALLC_REG0593127) attached to the CFTC's Complaint.

[21]     *See* instant message attached as Exhibit A (document number A_CFTC032878) attached to the CFTC's Complaint.

[22]     *See* instant message attached as Exhibit A (document number A_CFTC032910), attached to the CFTC's Complaint.

96.    Defendant Hunter knew that his selling would mute the effect of the buyers, whose purchases would tend to exert upward price pressure.

97.    At about the middle of the close on April 26, 2006, Defendants placed their first order to sell 500 May 2006 NYMEX natural gas futures contracts with instructions to hold execution of the order until the last eight minutes of the closing range, as part of the manipulation.

98.    The order ticket for that order indicates the instruction to wait to execute the order until the last eight minutes of the closing range.[23]

99.    Around the same time on April 26, 2006, Amaranth placed another order to sell 544 May 2006 contracts with instructions to hold execution of the order until the last eight minutes of the closing range, as part of the manipulation.

100.    In instant messages between Defendant Hunter and Chasman, which took place seven minutes into the start of the settlement period, Defendant Hunter explained that he was still "waiting to sell" his May natural gas futures contracts. Also, a taped telephone line at Gotham, a broker for Amaranth, captured Defendant Donohoe and brokers at Gotham as follows:

```
Barry:       Gotham.  Dave.
Donohoe:     T.J.
                          [pit noise in background]
T.J.:        Gotham T.
Donohoe:     Hey.
                          [pit noise in background]
T.J.:        Hey, Matty, what's up?
Donohoe:     In the last eight minutes . . .
T.J.:        Yes?
Donohoe:     . . . I need you to sell five hundred and forty Mays.
T.J.:        In the last eight minutes, sell 544 Mays.
Donohoe:     Yes.
T.J.:        You got it, my friend.
```

------

[23]    *See* copy of order ticket appearing on p.12, para. 56 of the CFTC's Complaint.

101.    The order ticket for that order also includes an instruction to wait to execute the order until the last eight minutes of the closing range.[24]  There is no legitimate explanation or business justification for this trading behavior.  Amaranth's strategy, according to FERC, was "calculated to maximize the downward effect on prices owing to vanishing liquidity toward the end of the settlement period."  FERC Order to Show Cause at ¶ 8.

102.    At about 2:22 p.m. on April 26, 2006, with only eight minutes left in the closing range, Amaranth placed a third order with Defendant ALX to sell 2,000 May 2006 contracts. This final order represents two-thirds of the position Amaranth held going into the closing range. The order ticket for the 2,000-lot order, with an indication that 1,675 of those lots were executed during the close.[25]  The 2,000-lot order was so large, and came so late in the closing range, that Defendant ALX was not able to execute the entire order during the closing range.

103.    By reason of Defendants' manipulative acts, the settlement price of the May 2006 contract decreased by approximately $.03.

104.    Amaranth's manipulation of the settlement of the May 2006 contract also had the effect of manipulating the prices of other NYMEX natural gas futures and options contracts such as the June and July 2006 contracts.  For example, Amaranth reported its resulting June 2006 option position profit as approximately $20,600,000, and Amaranth's June 2006 swap positions profited by approximately $6,700,000.  These profits were derived from the decline in prices of the June and July 2006 contracts that resulted from trading of the May 2006 contracts in the last two minutes of the settlement day, selling that was virtually dominated by Amaranth.

105.    As a result of Amaranth's trading behavior described in ¶¶ 86-104 above, the

---

[24]    See copy of order ticket appearing on p.13, para. 58 of the CFTC's Complaint.

[25]    See copy of order ticket appearing on p.14, para. 60 of the CFTC's Complaint.

FERC found that Amaranth manipulated the settlement price of the May 2006 contract. FERC

Order to Show Cause at ¶ 106. Amaranth's manipulation of the settlement price also

manipulated the price of other NYMEX natural gas futures and options contracts, including, *inter*

*alia*, the prices of the June and July 2006 contracts and subsequent natural gas futures and

options contracts.

106.     Amaranth employed the same scheme to manipulate the prices of NYMEX natural

gas futures prices throughout the Class Period including, *inter alia,* the June, July, and August

2006 NYMEX natural gas futures contracts.

**V.     After Warnings from NYMEX to Amaranth, Defendants Continue Their
        Market Manipulation via Secret Trading in Natural Gas Swaps on ICE**

107.     In support of their manipulative acts, the Amaranth Defendants, with the

assistance and knowledge of the Floor Trading Defendants and JPM Defendants: (a) repeatedly

violated NYMEX exchange rules by amassing substantial NYMEX natural gas futures contract

positions that exceeded applicable position limits; and (b) concealed their manipulative trading

from regulators and market participants by restructuring and eventually increasing the size of

Amaranth's natural gas positions on ICE after it was ordered by NYMEX to reduce its natural

gas positions which were so large that they were distorting natural gas market prices.

108.     On or about August 2, 2006, in furtherance of their official duties under the Act,

the NYMEX Compliance Department sent a letter to Amaranth inquiring about Amaranth's

trading of May 2006 NYMEX natural gas futures contracts on April 26, 2006 (the "August 2

Letter").[26]

109.     In the August 2 Letter, the NYMEX Compliance Department informed Amaranth

---

[26]     The August 2 Letter is attached as Exhibit B to the CFTC's Complaint.

that it had commenced an investigation to review Amaranth's natural gas trading activity on

April 26, 2006.

110.    Specifically, NYMEX's August 2 Letter stated that a heavy concentration of

Amaranth's trading of May 2006 contracts occurred in the final minutes prior to the termination

of trading in the contract, and that Amaranth sold 99% of its contracts in the final four minutes of

the closing range and 78% of its contracts in the final minute of the closing range.

111.    In the August 2 Letter, NYMEX requested that Amaranth review its May 2006

NYMEX natural gas futures trading activity for April 26, 2006 and provide a written explanation

of the commercial need and justification for its trading.

112.    Knowing, therefore, that NYMEX was investigating whether it had engaged in

banging the closing range, and that Amaranth's manipulation would unravel if the true account of

its trading activity were disclosed, in response to the NYMEX inquiry, Amaranth submitted a

letter to cover up what actually occurred.  In that letter, Amaranth falsely described its April 26,

2006 trading.

113.    On or about August 15, 2006, Amaranth sent a letter to NYMEX (the "August 15

Letter") in response to NYMEX's August 2 Letter.[27]

114.    The August 15 Letter contains a number of false and misleading statements,

including the manner in which Amaranth described its positions and trading strategy, deliberately

concealing from NYMEX that Amaranth had given specific instructions to its floor brokers on

April 26, 2006 as to when Amaranth's sales orders should be executed, claiming that it did not

decide to sell its March natural gas futures contracts outright until 2:17 p.m. or later, and

claiming that to the extent any part of Amaranth's orders was executed in the post-close trading

---

[27]    The August 15 Letter is attached as Exhibit C to the CFTC's Complaint.

session it was not due to Amaranth's instructions, but perhaps occurred because a floor broker erroneously failed to comply with Amaranth's directive to complete the execution of its orders during the closing range.

115.    In addition, in early August 2006, out of concern that Amaranth was disrupting the market, NYMEX directed Amaranth to reduce its holdings in certain natural gas futures contracts. This instruction was the culmination of several previous run-ins that Amaranth had with NYMEX regulators as the result of its massive natural gas positions, including repeatedly exceeding NYMEX natural gas speculative trading limited in the spot month. Amaranth responded to NYMEX's instructions by decreasing its positions on NYMEX, but also surreptitiously moving its positions in the September and October contracts to ICE by opening corresponding positions in ICE swaps.

116.    After moving its positions from NYMEX to ICE via a series of secret, orchestrated trades, Amaranth then placed even more trades on ICE and actually increased its overall positions in natural gas. Defendant JP Futures, with the knowledge of Defendant JPMC, carried these trades, provided financing for them, and was contemporaneously aware of Amaranth's positions in natural gas futures and swaps (including the fact that Amaranth had moved its NYMEX positions to ICE after NYMEX directed Amaranth to reduce its holdings). The JPM Defendants were also aware that NYMEX and the CFTC were investigating Amaranth's trading activity during the Class Period.

117.    Thus, NYMEX's attempts to prevent Amaranth's large volume of trading from disrupting the market were unsuccessful due to Amaranth's ability to conduct its speculative trading with the JPM Defendants' financial support, without any limitation or disclosure on ICE.

118.    Neither the CFTC nor NYMEX had a full view of Amaranth's trades, positions,

or overall market presence because Amaranth's trades on ICE were exempt from regulatory oversight and scrutiny. Unlike NYMEX, ICE had no legal obligation to monitor positions held by traders, or to report positions to the CFTC. Without a view of natural gas trades on ICE, neither the CFTC nor NYMEX had a full appreciation or understanding of how Amaranth's trading in natural gas was causing the price of natural gas to be artificial.

119.    Amaranth deliberately exploited the opacity of the ICE swap market in order to effectively flout regulators' attempts to curtail its excessive speculative trading on NYMEX.

## VI.    Amaranth's Scheme Collapses, Causing the Price of Natural Gas to Drop Drastically

120.    In mid-September 2006, the winter/summer price spreads suddenly tightened due to aggressive trading by other speculators, continuing large on-hand supplies of natural gas, and weather forecasts indicating that the 2006 hurricane season would pass with no major storm damage to natural gas production or storage facilities.

121.    As the price spreads suddenly tightened, Amaranth incurred substantial mark-to-market losses in its natural gas futures contracts and swaps, including in "long" positions in contracts for delivery of natural gas during the winter of 2006-07.

122.    These spiraling losses had the effect of decreasing and eventually eliminating Amaranth's ability to influence the price of natural gas. Amaranth's trading had been heavily financed by money borrowed on margin from the JPM Defendants. Therefore, when the market began to turn against it, Amaranth did not have sufficient capital to add to its positions and counteract adverse price movements (as it had done earlier in 2006).

123.    As Amaranth's margin debt spiraled and it faced intense regulatory pressure, the JPM Defendants eventually forced Amaranth to reduce its exposure in natural gas futures and swaps, as the margin loan from the JPM Defendants was no longer adequately collateralized.

124.    Amaranth then conducted secret meetings with major investment firms including Goldman Sachs, Morgan Stanley and Merrill Lynch, beginning on or about September 15, 2006, attempting to arrange private transactions in which Amaranth would reduce its exposure to natural gas in a privately negotiated transaction or transactions, without collapsing the market. Despite Amaranth's attempts to conceal its precarious situation, word of these secret meetings leaked out, fueling speculation that Amaranth was about to collapse.

125.    Amaranth did manage to strike a deal with Goldman Sachs that would have enabled it to substantially lower its risk exposure to natural gas. However, the deal fell through on September 18, 2006, when the JPM Defendants refused to deliver Amaranth's cash collateral held by JP Futures to Goldman Sachs as part of a deal that Amaranth had negotiated with Goldman Sachs. The JPM Defendants claimed that the deal between Goldman Sachs and Amaranth did not adequately protect the JPM Defendants from exposure to losses as a result of additional trading losses by Amaranth.

126.    Just two days later, on September 20, 2006, the JPM Defendants then scooped up much of Amaranth's natural gas portfolio for its own account. The JPM Defendants later earned $725 million from the takeover of Amaranth's natural gas portfolio.

127.    Amaranth lost more than $2 billion in the natural gas market during the first three weeks of September 2006, precipitating the liquidation of the entire $8 billion fund. During and after what amounted to Amaranth's forced liquidation, the price of natural gas and natural gas futures contracts traded on NYMEX experienced an astounding drop as the price artificiality caused by Amaranth's trading dissipated. For example, the price of the NYMEX futures contract to deliver natural gas in October 2006 plunged from $8.45 per million MMBtu to $4.80 per MMBtu. The price for immediate delivery of natural gas, referred to as the "spot price", plunged

from $7.49 per MMBtu in late August 2006 to $3.66 per MMBtu in early October-a collapse that

the Electric Power Research Institute described as "stunning. . . one of the steepest declines

ever."

128.    On June 25, 2007, the U.S. Senate Permanent Subcommittee on Investigations

issued a report summarizing the conclusions of its investigation into Amaranth and excessive

speculation in the natural gas market.  The Committee reached the following conclusions, among

others:

A.    FINDINGS

(1)    A single hedge fund, Amaranth Advisors LLC, dominated the U.S. natural gas
market in 2006.

(a) Amaranth accumulated massive natural gas holdings on NYMEX and ICE
spanning five years, from 2006-2010.

(b) Amaranth accumulated such large positions and traded such large volumes of
natural gas in 2006, on both NYMEX and ICE, that it had a direct effect on U.S.
natural gas prices and increased price volatility in the natural gas market. The
larger than usual differences between winter and summer futures prices that
prevailed during the spring and summer of 2006 were largely the result of
Amaranth's large-scale trades rather than the normal market interaction of many
buyers and sellers.

(c) Amaranth's 2006 positions in the natural gas market constituted excessive
speculation.

(2)    In August 2006, Amaranth traded natural gas contracts on ICE rather than on
NYMEX so that it could trade without any restrictions on the size of its positions.

(a) When NYMEX directed Amaranth to reduce its positions in September 2006
and October 2006 natural gas futures contracts, Amaranth simply transferred those
positions to ICE, an unregulated market, thereby maintaining its overall
speculative position in the natural gas market.

(b) NYMEX's attempt to limit speculative trading during the last day of trading
on the September 2006 natural gas futures contract failed, because neither
NYMEX nor the CFTC had any authority, mandate, or ability to limit trading on
ICE that affected the pricing of the NYMEX futures contract.

(3)    Amaranth's actions in causing significant price movements in the natural gas market demonstrate that excessive speculation distorts prices, increases volatility, and increases costs and risks for natural gas consumers, such as utilities, who ultimately pass on inflated costs to their customers.

*See* PSI Staff Report: *Excessive Speculation in the Natural Gas Markets*, available at

http://hsgac.senate.gov/_files/REPORTExcessiveSpeculationintheNaturalGasMarket.pdf.

### MOTIVE AND INTENT

129.    The Amaranth Defendants had an extraordinary financial motive to manipulate NYMEX natural gas  futures and options contract prices.

a.    First, Amaranth was the largest participant in the natural gas market and dominated trading in the U.S. natural gas financial markets during the Class Period.

b.    Also, Amaranth not only conducted substantial trading in the NYMEX natural gas futures and options market, but also held massive trading positions in the OTC natural gas financial markets.

c.    Amaranth profited handsomely from their manipulation of NYMEX natural gas futures and options contract prices, recording profits exceeding hundreds of millions of dollars.

130.    The Amaranth Defendants therefore had the ability, as well as a motive, to manipulate NYMEX natural gas and futures contract prices.

131.    The JPM Defendants had a financial incentive to aid and abet Amaranth's manipulation of NYMEX natural gas prices.

132.    Amaranth's natural gas trading generated enormous revenues for the JPM Defendants in the form of commissions and interest on margin balances.

133.    Despite the JPM Defendants' knowledge of Amaranth's manipulative trading

activities, the JPM Defendants chose to continue to finance Amaranth's natural gas trading even though such financing had the effect of continuing Amaranth's manipulation.

134.    The Floor Trading Defendants had a financial motive to aid and abet Amaranth's manipulative trading.

135.    Amaranth, as one of the largest traders on NYMEX, generated substantial revenue for the Floor Trading Defendants in the form of commissions.

136.    Rather than refuse Amaranth's request to effectuate multiple manipulative natural gas transactions and thereby forego substantial commission revenue from same, the Floor Trading Defendants knowingly executed Amaranth's manipulative trading strategy.

137.    The Floor Trading Defendants' execution of Amaranth's trading strategy caused manipulated natural gas futures and options prices.

138.    The Floor Trading Defendants therefore had the ability, as well as the motive, to aid and abet Amaranth's manipulation.

### EFFECTS

139.    As a result of the aforesaid unlawful acts,

a.    the prices of NYMEX natural gas futures and options contracts have been manipulated to artificial levels, and

b.    Plaintiff and other members of the Class have been damaged by these artificial prices.

140.    Determination of the specific amount of damages will require further discovery, including discovery that is in the sole position of Defendants.

### CLASS ACTION ALLEGATIONS

141.    Plaintiff brings this action as a class action under Rules 23(a) and (b)(3) of the

Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons, other than Defendants and their employees, affiliates, parents, or subsidiaries (whether or not named in this complaint), who purchased and/or sold NYMEX natural gas futures and options contracts between February 23, 2006 and September 20, 2006 (the "Class Period").

142.    The Class is so numerous that the individual joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believe that at least thousands of geographically dispersed Class members traded NYMEX natural gas futures and options contracts during the Class Period.

143.    Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class.  These common questions of law and fact include, without limitation:

a.    Whether the alleged manipulation of NYMEX natural gas futures contract prices based on Defendants' unlawful conduct violates the CEA;

b.    Whether Defendants' conduct had an effect on the prices of NYMEX natural gas futures contracts and options purchased or sold by Plaintiff and the Class during the Class Period; and

c.    The appropriate measure of damages sustained by Plaintiff and the other members of the Class.

144.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

145.    Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members.  Plaintiff has retained counsel who have substantial experience and success in the prosecution of complex class action litigation, including commodity futures manipulation class action litigation.

146.    A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

147.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### FRAUDULENT CONCEALMENT

148.    By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, *inter alia*, engaged in secret and surreptitious trading on the ICE in order to manipulate and make artificial prices for natural gas futures and options on the NYMEX.

149.    Plaintiff and members of the Class had no knowledge of the unlawful conduct

alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until they became public in or about June 2007.

150.    Because the Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in or about June 2007.

151.    Due to the fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST THE AMARANTH DEFENDANTS FOR MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. SECTION 1

152.    Plaintiff repeats and re-alleges the previous allegations as if fully set forth herein.

153.    Plaintiff and members of the Class purchased and sold one or more NYMEX natural gas futures and options contracts during the Class Period, and were injured as a result of Defendants' manipulation of the price of those contracts, and/or the price of the natural gas underlying those contracts, in violation of the CEA, 7 U.S.C. § 1, *et seq.*

154.    Defendants' activities alleged herein constitute manipulation of the price of NYMEX natural gas futures and options contracts, and/or the price of the natural gas underlying those contracts, during the Class Period in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

155.    Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

### AS AND FOR A SECOND CAUSE OF ACTION AGAINST THE FLOOR TRADING DEFENDANTS FOR AIDING AND

**ABETTING VIOLATIONS OF THE COMMODITY EXCHANGE ACT**

156.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

157.    Defendants ALX and DeLucia knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants ALX and DeLucia did so knowing of Amaranth's manipulations of NYMEX natural gas futures prices, and willfully intended to assist these manipulations to cause the price of NYMEX natural gas contracts to be artificial during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

158.    Defendants ALX and DeLucia were at all relevant times Amaranth's primary NYMEX floor brokerage firm and floor trader. Defendant Amaranth was ALX's largest customer, and one of its key employees, Vincent Rufa, traveled to Calgary and socialized with Amaranth employees on multiple occasions. Throughout the Class Period, Defendants ALX and DeLucia substantially assisted in the aforesaid manipulations by executing the trades for Amaranth, while simultaneously being informed of the nature of the manipulative intent of the trading engaged in by Amaranth.

159.    Plaintiff and the Class are each entitled to actual damages for the violation of the CEA alleged herein.

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST THE JPM DEFENDANTS FOR AIDING AND ABETTING VIOLATIONS OF THE COMMODITY EXCHANGE ACT**

160.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

161.    Defendant JPMC, through its wholly owned subsidiary Defendant JP Futures,

knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged

herein. The JPM Defendants did so knowing of Amaranth's manipulation of NYMEX natural

gas futures prices, and willfully intended to assist these manipulations to cause the price of

NYMEX natural gas futures and options contracts to be artificial during the Class Period, in

violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

162.    The JPM Defendants substantially assisted in the aforesaid manipulations by

executing the trades and providing credit to Amaranth, while simultaneously being informed of

the nature of the manipulative pattern of trading engaged in by Amaranth. The JPM Defendants

had risk management procedures in place at relevant times that caused it to be fully aware of

Amaranth's positions and the effects of same on the market.

163.    Plaintiff and the Class are each entitled to actual damages for the violation of the

CEA alleged herein.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANT MAOUNIS FOR AIDING AND ABETTING COMMODITIES FRAUD AND CONTROL PERSON LIABILITY

164.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as

though fully set forth herein.

165.    Defendant Maounis was the principal of the Amaranth Defendants and willfully

aided, abetted, counseled, induced, or procured the commission of violations of the Commodities

Exchange Act by defendant Amaranth.

166.    Additionally or alternatively, Defendant Maounis directly controlled the Amaranth

Defendants. As a controlling person, Defendant Maounis is liable under Section 4(b) of the

Commodities Exchange Act, 7 U.S.C. § 6(b) pursuant to Section 13(b) of the Act, 7 U.S.C.

§ 13c(b).

167.    Plaintiff and the Class are each entitled to actual damages for Defendant

Maounis's violations of the CEA alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and

(b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class

representative and his counsel as Class counsel;

(B)    For a judgment awarding Plaintiff and the Class damages against Defendants for

their violations of the CEA, together with prejudgment interest at the maximum rate allowable by

law;

(C)    For an award to Plaintiff and the Class of their costs of suit, including reasonable

attorneys' and experts' fees and expenses;

(D)    For such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff respectfully demands a trial by jury.

Dated: White Plains, NY
       August 10, 2007

LOWEY DANNENBERG BEMPORAD
SELINGER & COHEN, P.C.

By:  _____

Vincent Briganti, Esq.
Geoffrey Horn, Esq.
One North Broadway
White Plains Plaza, 5th Floor
New York, New York 10601
914-997-0500

*Attorneys for Plaintiff*